541 So.2d 148 (1989)
Arthur TRAGER, Appellant/Cross Appellee,
v.
Barbara Joy TRAGER, Appellee/Cross Appellant.
No. 87-2722.
District Court of Appeal of Florida, Fourth District.
April 5, 1989.
William I. Zimmerman of William I. Zimmerman, P.A., Pompano Beach, for appellant/cross appellee.
Andrew M. Chansen, Boca Raton, for appellee/cross appellant.
PER CURIAM.
We affirm both the main appeal and the cross appeal except for that issue of *149 the main appeal dealing with the provision in the final judgment which reads:
7. The Husband shall maintain a term life insurance policy on his life in the sum of $50,000.00 with HOLLY JOY TRAGER as the beneficiary of said life insurance policy.
Section 61.13(1)(d), Florida Statutes (1987), provides that:
To the extent necessary to protect an award of child support, the court may order the obligor to purchase or maintain a life insurance policy or a bond, or to otherwise secure the child support award with any other assets which may be suitable for that purpose.
In Bosem v. Bosem, 279 So.2d 863 (Fla. 1973), the Florida Supreme Court held that a trial judge has the power, pursuant to section 61.13, Florida Statutes, to require the maintenance of a life insurance policy insuring the life of the payor of child support payable to the minor children until the children reach majority or are emancipated. This court, in Eberly v. Eberly, 344 So.2d 886, 888 (Fla. 4th DCA 1977), stated:
We hold that the chancellor in a dissolution proceeding may not, absent the father's agreement, order him to maintain life insurance for the absolute benefit of his minor children. Insurance protection may be so required only for the benefit of children for whom money support is otherwise lawfully ordered, and only as security for the payment of that support during minority.
(Emphasis added).
In the instant case, the provision requiring the husband to maintain a life insurance policy for the benefit of the minor child fails to state that the insurance is to serve as security only to the extent of prospective child support in the event of the father's death. The subject provision requires clarification in this regard. Accordingly, we remand with direction to the trial court for clarification that the life insurance is to be maintained as security for the support of the minor child in the event of the husband's death.
With respect to the issue of the amount of child support ordered to be paid by the husband, we find no error. Section 61.30, Florida Statutes (1987), became effective after the date this case was filed and is not applicable to it.
For the information of the bench and bar, mention is made that section 467(b) of the Social Security Act, 42 U.S.C.A. § 667(b), read as follows in 1987:
§ 667. State guidelines for child support awards
(a) Establishment of guidelines; method.
Each State, as a condition for having its State plan approved under this part, must establish guidelines for child support award amounts within the State. The guidelines may be established by law or by judicial or administrative action. (b) Availability of guidelines; binding nature
The guidelines established pursuant to subsection (a) of this section shall be made available to all judges and other officials who have the power to determine child support awards within such State, but need not be binding upon such judges or other officials.
(c) Technical assistance to States; State to furnish Secretary with copies.
The Secretary shall furnish technical assistance to the States for establishing the guidelines, and each State shall furnish the Secretary with copies of its guidelines.
However, Title 1 of the Family Support Act of 1988 made the following amendments:
Sec. 103. State Guidelines for Child Support Award Amounts.
(a) GUIDELINES TO CREATE REBUTTABLE PRESUMPTION.  Section 467(b) [42 U.S.C.A § 667(b)] of the Social Security Act is amended 
(1) by inserting "(1)" after "(b)";
(2) by striking ", but need not be binding upon such judges or other officials"; and
(3) by adding at the end the following new paragraph:
"(2) There shall be a rebuttable presumption, in any judicial or administrative proceeding for the award of child *150 support, that the amount of the award which would result from the application of such guidelines is the correct amount of child support to be awarded. A written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case, as determined under criteria established by the State, shall be sufficient to rebut the presumption in that case."
We further call to the attention of the bench and bar the article on this subject entitled Supporting Children After Divorce: The Influence of Custody on Support Levels and Payments, by Doctors Jessica Pearson and Nancy Thoennes of the Center for Policy Research in Denver, Colorado, which article appears in Family Law Quarterly, Fall 1988. The authors state:
It has been widely documented that many divorced fathers fail to comply with court-mandated child support and that the lack of child support payments from the noncustodial parent is a major cause of welfare dependency in female-headed households and the impoverishment of a growing number of children. For example, an analysis of women surveyed in the 1975 Survey of Income and Education and the 1979 Supplement to the Current Population Survey revealed that only 25 percent and 35 percent, respectively, of demographically eligible women received some child support payments; in cases where child support was ordered, the average order amounted to only about 70 percent of the poverty standard and only about one-fourth of the estimated normal level of expenditures on children within intact families.
What is less well understood are the causes of nonpayment and the impact of psychological and emotional factors on the payment of support following divorce. Although the evidence is sparse, the data suggest that the parent-child and spousal relationship factors are relevant. For example, in one of his Michigan county samples, Chambers found that fathers who had little or no contact with their children after the divorce paid only about 34 percent of their child support, while fathers in regular contact paid 85 percent. Based upon an assessment of sixty families, Wallerstein and Huntington concluded that there was a relationship between the frequency, regularity and flexibility of visitation and the payment of child support which emerged at eighteen months following separation and held over the five-year period of their study. In a national survey, Furstenberg and Zill found a positive relationship between the provision of child support and the frequency of contact with the child. And preliminary interviews with thirty-four noncustodial parents and one hundred twenty-five custodial parents led Braver to conclude that conflict between the parents was the best predictor of both child support payment performance and visitation behaviors.
Id. at 319-20 (footnotes omitted). The authors concluded:
Although our data do not support more aggressive joint custody policies, they do support policies calling for the provision of more widespread and effective information about the joint custody option to divorcing couples. We found that mothers with joint residential custody were generally satisfied with both the custody arrangement and the accompanying financial agreement. Child support payment among this population was significantly more regular and complete.
Id. at 336. They also said:
Moving beyond the issue of custody, our findings revealed the importance of access and paternal participation for the financial welfare of children. Visitation and paternal participation were the key predictors of financial and in-kind payments outside of support by absent parents. We found that extra payments served to supplement child support and were not paid in its stead. According to other researchers, supplementary and in-kind payments are common among both AFDC and non-AFDC fathers and represent a substantial ingredient in the post divorce welfare of children. If, as we *151 have found, such payments are maximized by visitation and paternal participation, future policy should seek to enhance access.
... .
In addition to custody and visitation factors, our analysis revealed the importance of employment stability proved to be the key one in predicting payment.
... .
Next to employment stability, the relationship between the parents was a key predictor of whether child support was paid. Mothers who were re-interviewed frequently felt that their ex-spouse refused to pay support because of anger and a perception that the support money was going to the wife rather than to the children. Interviews with fathers subject to the child support enforcement program in North Carolina revealed that unemployment of the father and the belief that the mother does not spend the money on the children were the two justifications for missed child support payments that fathers believed were defensible. These findings argue for child support payment methods that are neutral, automatic and free of any contact with an ex-wife.
... .
Lastly, and perhaps most importantly, the analysis revealed the woeful inadequacy of ordered levels of child support across all custody categories. Modal per child orders in our sample were approximately at the poverty standard and only about one-third of the estimated normal levels of expenditures on children within intact families. These shortfalls appear to be consistent with national estimates. In addition to being established at unrealistically low levels, few orders in our sample contained provisions for modification or the payment of the child's future, higher education costs. Interviews with mothers regarding their child support needs revealed unrealistically low estimates and suggested a good deal of ignorance regarding the true costs of raising children.
... .
The deficiency in child support orders results from both inadequate initial child support orders as well as the absence of systematic updating procedures for orders in effect. As a result, policies are needed to ensure that initial orders are established in accordance with sound economic evidence on the costs of child rearing as well as effective programs for periodic updating of child support to reflect changed circumstances of the parents and needs of the children, including higher education costs.
Id. at 337-39.
As for the cross appeal, this case, like so many dissolutions, affects the well being of the child by her being uprooted from the physical security of her surroundings. Hopefully, those responsible for her nurturing will soften this blow. We affirm the cross appeal because it is clear that the purpose for ordering the sale of the marital home was to achieve an equitable distribution of the parties' assets. The marital home is indisputably the parties' principal asset.
GLICKSTEIN, J., concurs.
DELL, J., concurs specially with opinion.
WARNER, J., concurs in part and dissents in part with opinion.
DELL, Judge, concurring specially.
I agree that this case should be remanded to the trial court for clarification that the life insurance is to be maintained as security for the support of the minor child in the event of the husband's death. I also find no error in the amount of support ordered to be paid or in the trial court's order directing the sale of the marital home in order to achieve an equitable distribution of the parties' assets.
WARNER, Judge, concurring in part and dissenting in part.
Although I concur with the majority's analysis of the issues on the main appeal, I must respectfully dissent as to the issue on cross appeal.
*152 The trial court declined to award to the wife exclusive possession of the marital residence for the minority of the minor child and instead ordered the house sold. The minor child has lived all of her life in this home and is presently eleven years old. There is no mortgage on the home and thus it is an economical place for both the mother and daughter to live. Nevertheless, the trial court denied a request for exclusive possession, electing instead to sell the home, apparently in order to achieve equitable distribution of the assets.
In Zeller v. Zeller, 396 So.2d 1177 (Fla. 4th DCA 1981), this court held that the trial court erred in limiting the wife's exclusive occupancy in the home for a three-year period. The court stated:
Although the failure to award exclusive possession of the marital home unto the custodial parent until all the children obtain majority or become emancipated would not always constitute error, such awards are so frequently ordered that they have become a generally accepted principal of the law of divorce. These awards are proper because they are in the nature of maintenance and support.
More recently in Cabrera v. Cabrera, 484 So.2d 1338 (Fla. 3d DCA 1986) the Third District said:
Cases dealing with the issue of whether the custodial parent should be awarded the exclusive use and possession of the marital home until the children reach majority or the parent remarries have almost without exception answered the question affirmatively.
See also Neustein v. Neustein, 503 So.2d 439 (Fla. 4th DCA 1987).
I see no basis for an exception in this case. Although the home is the principal asset of the parties, it is not the only asset. The husband will retain substantial liquid assets after the divorce. Furthermore, he will continue to own his share of the marital residence. He simply will not be able to liquidate it at this time.
Because exclusive possession is simply a part of an award which comprises varying and interrelating parts, I would reverse and remand for reconsideration of the final judgment. Kirk v. Kirk, 488 So.2d 650 (Fla. 1st DCA 1986).